## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

**COMMODITY FUTURES TRADING COMMISSION,**

        Plaintiff,

v.

**JAFIA LLC, SAM IKKURTY A/K/A SREENIVAS I RAO, AND RAVISHANKAR AVADHANAM,**

        Defendants,

**IKKURTY CAPITAL, LLC D/B/A ROSE CITY INCOME FUND I, ROSE CITY INCOME FUND II LP, SENECA VENTURES, LLC,**

        Relief Defendants.

Case No.:

1:22-cv-02465
Judge Mary M. Rowland
Magistrate Judge Jefrey Cummings
RANDOM

**FILED**

MAY 10 2022 cm

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

i

# Table of Contents

I.     INTRODUCTION ...............................................................................................................1

II.    THE PARTIES ...................................................................................................................3

III.   JURISDICTION AND VENUE ........................................................................................4

IV.    FACTS ...............................................................................................................................6

A.    Background and Solicitations ...........................................................................................6

B.    Solicitations Include False and Misleading Statements and Omissions .................................9

C.    The Misappropriation ....................................................................................................10

D.    Seneca Ventures' Accounts ...........................................................................................11

E.    Rose City's Accounts ....................................................................................................13

F.    Jafia Account..................................................................................................................15

V.     ARGUMENT....................................................................................................................15

   A.    Defendants Failed to Register with the CFTC as a CPO in Violation of Section 4m(1) of the Act.......................................................................................................................15

   B.    Defendants Committed Fraud as a Commodity Pool Operator in Violation of Section 4o(1)(A) and (B) of the Act ...........................................................................................16

      1.    Defendants Engaged in CPO Fraud.........................................................................17

   C.    Defendants Violated Section 6(c)(1) of the Act and Regulation 180.1(a) ..............................................................................................................21

VI.    RELIEF SOUGHT............................................................................................................24

   A.    The Act Authorizes an *Ex Parte* Statutory Restraining Order Freezing the Defendants' Assets and Prohibiting the Destruction of Books and Records .........................................24

   B.    The CFTC Has Established a Prima Facie Case of Illegality Against Defendants and The Court Should Issue an *Ex Parte* Statutory Restraining Order ...........................................25

   C.    The Appointment of a Receiver is Necessary to Protect the Public Interest ....................26

   D.    Thereafter, the Court Should Enter an Order of Preliminary Injunction ..............................................................................................................27

VII.   CONCLUSION..................................................................................................................28

# Table of Authorities

## Cases

*Arkansas Louisiana Gas Co. v. Kroeger*, 303 F.2d 129 (5th Cir. 1962) ........................26

*Basic, Inc. v. Levinson*, 485 U.S. 224 (1988) ..............................................................19

*Cange v. Stotler & Co. Inc.*, 826 F.2d 581 (7th Cir. 1987) ...................................23

*CFTC v. Am. Commodity Grp. Corp.*, 753 F.2d 862 (11th Cir. 1984) ..........................26

*CFTC v. British Am. Commodity Options Corp.,*560 F. 2d 135 (2d Cir. 1977) ..................27

*CFTC v. Co. Petro Mktg. Corp.*, 680 F.2d 573, (9th Cir. 1982) ...................................27

*CFTC v. Commonwealth Fin. Grp.,* 874 F. Supp. 1345 (S.D. Fla. 1994) ........................20

*CFTC v. Flint McClung Capital LLC*, No. 11-cv-01644-CMA-BNB, 2012 WL 639321, at 8
(D. Co. Feb. 28, 2012) .........................................................................................20

*CFTC v. Gramalegui*, No. 15-cv-02313-REB-GPG, 2018 WL 4610953, at 19
(D. Co. Sept. 26, 2018) ........................................................................................20

*CFTC v. Hunt*, 591 F. 2d 1211(7th Cir. 1979)...............................................................28

*CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187 (4th Cir. 2002)..........................24

*CFTC v. McDonnell*, 332 F. Supp. 3d 717(E.D.N.Y. 2018) .......................................22

*CFTC v. Morgan, Harris & Scott, Ltd.*, 484 F. Supp. 669 (S.D.N.Y. 1979); ..............26

*CFTC v. Morse*, 762 F.2d 60 (8th Cir. 1985) .............................................................20

*CFTC v. Muller*, 570 F.2d 1296 (5th Cir. 1978)......................................................25, 27

*CFTC v. R.J. Fitzgerald & Co., Inc.*, 310 F.3d 1321, (11th Cir. 2002)...................17, 18

*CFTC v. Savage*, 611 F.2d 270 (9th Cir. 1980).............................................................18

*CFTC v. Schroeder*, 2006 WL 3692481 (W.D. Mich. Sept. 27, 2006) .........................26

*CFTC v. Sidoti,* 178 F. 3d 1132 (11th Cir. 1999) .......................................................27

*CFTC v. Skorupskas*, 605 F.Supp. 923 (E.D. Mich. 1985) ....................................17, 21

*CFTC v. Vartuli*, 228 F.3d 94, (2d Cir. 2000) .........................................................17

*CFTC v. Weinberg*, 287 F. Supp. 2d 1100 (C.D. Cal. 2003)......................................17

*CFTC v. Wilshire Inv. Mgmt. Corp.,* 531 F. 3d 1339, (11th Cir. 2008) ........................27

*Commodity Trend Serv. v. CFTC*, 233 F.3d 981 (7th Cir. 2000) ..................................18

*Drexel Burnham Lambert, Inc. v. CFTC*, 850 F.2d 748 (D.C. Cir. 1988)......................23

*FTC v. A1 Janitorial Supply Corp.*, 2020 WL 887386, at (N.D. Ill. Feb. 24, 2020)...................26

*Hammond v. Smith Barney Harris Upham & Co.*, CFTC No. 86-R131, 1990 WL 282810, at 4, n.12 (Mar. 1, 1990) .......................................................................................................18

*Lawrence v. CFTC*, 759 F. 2d 767 (9th Cir. 1985) ...................................................23

*McCarthy v. PaineWebber, Inc.*, 618 F. Supp. 933 (N.D. Ill. 1985) ........................23

*Messer v. E.F. Hutton & Co.*, 847 F.2d 673 (11th Cir.1988) ....................................18

*Noble Wealth Data Info. Servs., Inc.*, 90 F. Supp. 2d 676, ......................................20

*SEC v. Jakubowski*, 150 F.3d 675 (7th Cir. 1998) ....................................................20

*SEC v. Zufelt*, No. 2:10-cv-574-DB-DBP, 2016 WL 5404746, at 6 (D. Utah Aug. 8, 2016) .......24

*Stotler & Co. v. CFTC*, 855 F.2d 1288, (7ᵗʰ Cir. 1988) ...........................................17

*Wasnick v. Refco, Inc.*, 911 F.2d. 345(9th Cir. 1990) ...............................................23

## Statutes

28 U.S.C. § 1331 (2018) .............................................................................................4

28 U.S.C. § 1345 (2018) .............................................................................................4

7 U.S.C. § 13a-1 (2018) .........................................................................................2, 25

7 U.S.C. § 13a-1(a) (2012) ...................................................................................24, 26

7 U.S.C. § 13a-1(a) (2018) ........................................................................................27

7 U.S.C. § 13a-1(b) (2012) ........................................................................................25

7 U.S.C. § 13a-1(e) (2018) ..........................................................................................5

7 U.S.C. § 1a(10) (2018) ...........................................................................................15

7 U.S.C. § 6m(1) (2018) ....................................................................................2, 16, 28

7 U.S.C. § 6*o*(1)(A)(2018) .........................................................................................28

7 U.S.C. § 6*o*(1)(B)(2018) .........................................................................................28

7 U.S.C. § 9(1) ....................................................................................................2, 28

7 U.S.C. §13a-1(a)(2018) .......................................................................................1, 4

## Regulations

17 C.F.R. § 180.1(a) ...............................................................................................2, 28

17 C.F.R. § 4.15 (2019) .............................................................................................17

17 C.F.R. pts. 1-190 (2019) .........................................................................................3

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR AN *EX PARTE* STATUTORY RESTRAINING ORDER, THE APPOINTMENT OF A TEMPORARY RECEIVER AND PRELIMINARY INJUNCTION

Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission") submits this Memorandum of Law in Support of its Motion for an *Ex Parte* Statutory Restraining Order, Appointment of Temporary Receiver and Preliminary Injunction against Defendants Jafia, LLC ("Jafia"), Sam Ikkurty a/k/a Sreenivas I Rao ("Ikkurty"), Ravishankar Avadhanam ("Avadhanam"), and Relief Defendants Ikkurty Capital, LLC d/b/a Rose City Income Fund I ("Rose City I"), Rose City Income Fund II LP ("Rose City"), and Seneca Ventures, LLC, ("Seneca Ventures"), pursuant to section 6c(a) of the Commodity Exchange Act ("CEA" or "Act"), 7 U.S.C. §13a-1(a)(2018), and in accordance with Rule 65 of the Federal Rules of Civil Procedure.

## I.       INTRODUCTION

The Commission seeks emergency injunctive relief against Defendants Ikkurty, Avadhanam and Jafia for violating core anti-fraud provisions of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1 *et seq.* (2018) and Relief Defendants Rose City Income Fund I, Rose City and Seneca Ventures, who are in possession of ill-gotten gains to which they have no legitimate claim.

Defendants solicited and accepted at least $44 million from the general public, purportedly to participate in an income fund that buys, sells, and trades digital assets, among other things, using misrepresentations regarding, among other things, the truth about what Defendants were doing with customer funds, historical performance of the fund, likelihood of profits, risk of loss, and management fees. In reality, the Defendants operated a Ponzi-like

1

scheme in which they distributed some customer funds to other customers as "gains," to bank accounts controlled by and for the benefit of Defendants, and to an off-shore entity.

Based on this conduct, the CFTC brought this action against Defendants for violating the Act. Count I of the CFTC's Complaint alleges that Defendants violated Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2018), by acting as a CPO without the benefit of registration with the Commission. Count II alleges that Defendants committed fraud as a Commodity Pool Operator ("CPO") in violation of 4o(A) and (B) of the Act. Count III of the CFTC's Complaint alleges that Defendants violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1, 17 C.F.R. § 180.1(a), by making or attempting to make untrue or misleading statements of material fact or omitting to state or attempting to omit material facts necessary in order to make statements made not untrue or misleading, misappropriating customer funds, and employing a manipulative or deceptive device or contrivance or manipulative device, scheme, or artifice to defraud participants.

Pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), the CFTC hereby moves the Court to enter a Statutory Restraining Order against Defendants Ikkurty, Avadhanam, Jafia, and Relief Defendants Rose City I, Rose City and Seneca Ventures which preserves the status quo by (1) freezing assets by prohibiting them from withdrawing, transferring, removing, dissipating, or disposing of any funds, assets, or other property, (2) prohibiting them from destroying any records, and (3) permitting the CFTC to inspect their records, including through authorizing the copying of the records to allow inspection to occur and requiring Defendants to provide information necessary to locate and access those records. The CFTC also seeks the appointment of a Temporary Receiver to supervise administration of the receivership. Finally, the CFTC also seeks an Order of Preliminary Injunction to continue this relief, to restrain Defendants from

2

committing further violations of the Act, and to provide for other equitable relief this Court deems necessary or appropriate.[1]

## II.     THE PARTIES

Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with administering and enforcing the Act and CFTC Regulations ("Regulations"), 17 C.F.R. pts. 1-190 (2019).

Defendant **Sam Ikkurty** ("Ikkurty") a/k/a Sreenivas I Rao resides in Portland, Oregon. Ikkurty has never been registered with the CFTC in any capacity. (Dasso Decl. ¶ 6.)

Defendant **Ravishankar Avadhanam** ("Avadhanam") resides in Aurora, Illinois. Avadhanam has never been registered with the CFTC in any capacity. (Dasso Decl. ¶ 7.)

Defendant **Jafia, LLC** ("Jafia"), is a Florida company that Ikkurty established in 2006. Ikkurty owns Jafia and is the sole officer, president, registered agent and authorized person for the entity. Jafia has never been registered with the CFTC in any capacity. (Ex. 1, Dasso Declaration ("Dasso Decl.") ¶ 8.)

Relief Defendant **Ikkurty Capital LLC d/b/a Rose City Income Fund** ("Rose City Income Fund I") is a Florida corporation that was established in 2013. Ikkurty is the Managing Member and registered agent for Rose City Income Fund I, and Jafia is the Manager. Rose City Income Fund I did not perform any legitimate services for Defendants and does not have any legitimate interest in any funds it received from or through Defendants. Rose City Income Fund I has never been registered with the CFTC in any capacity. (Dasso Decl. ¶ 9.)

---

[1] In further support of its Emergency Motion for *Ex Parte* Statutory Restraining Order and its Motion for Preliminary Injunction, the CFTC submits with this Memorandum the Declaration of Heather Dasso, Senior Investigator for the CFTC and the exhibits attached thereto.

Relief Defendant **Rose City Income Fund II LP** ("Rose City Income Fund II") is a Delaware entity that was established on December 10, 2020, with its principal place of business in Portland, Oregon. Ikkurty is the Principal, Officer and Managing Partner of Rose City. Jafia is the General Partner of Rose City. Ikkurty and Avadhanam run Rose City. Rose City did not perform any legitimate services for Defendants and does not have any legitimate interest in any funds it received from or through Defendants. Rose City has never been registered with the CFTC in any capacity. (Dasso Decl. ¶ 10.)

Relief Defendant **Seneca Ventures LLC** ("Seneca Ventures") is a Wyoming entity that was established on April 14, 2021. Ikkurty and Avadhanam own Seneca Ventures. Seneca Ventures did not perform any legitimate services for Defendants and does not have any legitimate interest in any funds it received from or through Defendants. Seneca Ventures has never been registered with the CFTC in any capacity. (Dasso Decl. ¶ 11.)

### III.     JURISDICTION AND VENUE

This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2018) (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (2018) (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2018), provides that U.S. district courts have jurisdiction to hear actions brought by the Commission for injunctive and other relief or to enforce compliance with the Act whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

4

Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2018), because Defendants transacted business in this District, Defendant Avadhanam resides in this District, and certain of the acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this District, among other places.

## IV.  FACTS

### A.  Background and Solicitations

Beginning at least in October, 2017, Ikkurty launched Rose City Income Fund I, which also used the name Ikkurty Capital, LLC.  (Dasso Decl. ¶¶ 12, 13.)  The website for the fund, www.rosecityfund.com, describes the business as "a monthly income fund" and states that it is "suited for income-oriented investors who depend on a steady distribution."  (Dasso Decl. ¶ 13.) Ikkurty routinely posted blog posts to the website with information about digital assets and his opinions on the market.  In a September 2018 post on the Rose City Income Fund I website Ikkurty announced, "[w]e are pleased to announce to the partners that we have a 1-year return for the fund.  In a severe bear market that we are currently experiencing in digital currencies, our 1-year return is 61.78%."  *See* (Dasso Decl. ¶ 13.)  The post goes on to encourage investors by stating, "[c]ompounding is a powerful force in investing . . .  I feel we have a long runway to achieve growth [as] a digital currency market evolves."  *Id.*

Rose City Income Fund I evolved and Ikkurty formally established Rose City Income Fund II LP ("Rose City") on or about December 10, 2020.  (Dasso Decl. ¶ 10.)  Ikkurty named himself as the Managing Member and Jafia as the Executive Officer.  *Id.*  Rose City's business model is purportedly to sell limited partnership interests to participants, pool the limited partners' funds, and then "buy, sell and trade digital assets on cryptocurrency exchanges."  Rose City represents that its "primary goal is to provide [a] steady 15% per year distribution to our investors," explaining that Rose City "generates these returns via proof-of-stake mining," and by holding crypto assets, including Bitcoin and Ethereum.  *See* (Dasso Decl. ¶ 13.)  For example, Rose City represents that "Bitcoin is a great hedge against central banks . . . Our portfolio is ideally suited to hedge against money printing."  *Id.*  The formal establishment of Rose City

included the introduction of a partnership agreement that reveals key details of Defendants'
scheme.

On or about January 1, 2021, Defendants began using the Rose City Income Fund
Limited Partnership Agreement (the "Agreement") as part of their solicitation of participants.
(Dasso Decl. ¶ 14.) The Agreement identifies Jafia as the "General Partner" to the Agreement
and all the participants who sign copies of the Agreement as the "Limited Partners." *Id*.
Pursuant to Section 1.03 of the Agreement, the purpose of the partnership is "to serve as a fund
through which the assets of its Partners will be utilized to invest, hold and trade in digital
currencies, cryptoassets, cryptocurrencies, decentralized application tokens and protocol tokens
… and other financial instruments of any name and nature which exist now or are hereafter
created …" (Dasso Decl. ¶ 16.)

Pursuant to Section 3.02, Powers of the General Partner, the General Partner maintains,
in relevant part, the following powers:

> (a) To purchase, hold, sell, sell short, cover and otherwise deal in Digital Assets
> and financial instruments of any sort and rights therein, including restricted
> and privately issued instruments, on margin or otherwise;
>
> (b) To loan its Digital Assets to other market participants and engage in "staking"
> of Digital Assets;
>
> (c) Write, purchase, hold, sell and otherwise deal in put and call options of any
> sort and in any combination thereof;
>
> (d) To purchase, hold, sell, sell short and otherwise deal in commodities,
> commodity contracts, commodity futures, financial futures (including index
> futures) and options in respect thereof;

7

(e) To purchase, hold, sell, sell short and otherwise deal in currencies, options thereon and rights therein, including forward foreign currency exchange contracts;

(f) To purchase, hold, sell and otherwise deal in derivatives, swap contracts, partnership interest, interests in other investment companies or any other financial instruments which exist now or are hereafter created; and

(g) To conduct margin accounts with brokers . . .

(Dasso Decl. ¶ 17.)

Also, Pursuant to Section 4.04 of the Agreement, the General Partner is entitled to a "Management Fee," to be "calculated at an annual rate of 2.0% of each Capital Account." (Dasso Decl. ¶ 18.)  Capital Account is defined in the Agreement to include the limited partner's capital contributions, adjusted for net losses and profits, less withdrawals, taxes and Management Fee payments.

By February 1, 2021, at least one individual signed the Agreement, joined Rose City's Limited Partnership, and deposited funds to Rose City.  (Dasso Decl. ¶ 15.)

In addition to the Agreement, Defendants also continue to solicit participants through Rose City's website and a publicly available YouTube video.  Rose City's website represents that the fund's investment strategy is to invest "70% of the fund's assets into proof-of-stake mining coins, using market-neutral strategies while having 30% of the fund [] exposed to Crypto assets like Bitcoin, Ethereum and other diversified crypto assets."  *See* (Dasso Decl. ¶¶ 12,13.) Rose City's website claims that its philosophy is to "earn income with exposure to crypto assets" and the fund's goal is to "provide a steady income to our investors every month, while providing

8

the upside to the crypto markets." *Id*. Specifically, Rose City states that, "[o]ur number one goal is to provide a steady 15% per year in distribution, payable monthly." *Id.*

Beginning in at least July 2021, Defendants also solicited participants through a YouTube video that represented to prospective participants:

- "Rule 1: Pay 18% per year interest on our Crypto Savings Note on a monthly basis"

- "We offer a promissory note enforceable by law in the USA that pays 18% interest per year and returns the original principal at the end of 18 months. This is backed by the full faith and credit of Jafia LLC."

(Dasso Decl. ¶ 19.) The YouTube video also touts Rose City's "proven track record of generating a 48% yield" and go on to assure participants that Rose City "make[s] sure that the money you start with will not be lost." *Id.*

## B.   Solicitations Include False and Misleading Statements and Omissions

Defendants intentionally or recklessly include false and misleading statements and omissions of material facts in their solicitations.

First, Defendants falsely misrepresent that 70% of the fund's assets are invested in proof-of-stake mining coins and also that the fund "earns" income from these assets. It is clear that neither Rose City nor Seneca Ventures is holding "70% of its assets" in "proof-of-stake mining coin" that generate any income for the fund. There are no "profits" or "income" flowing into the funds' bank accounts.   (Dasso Decl. ¶¶ 23, 28, 29, 33, 45.)

Second, Defendants falsely misrepresent that the fund will "invest, hold and trade in digital currencies," "purchase, hold, sell, sell short and otherwise deal in commodities, commodity contracts, commodity futures, financial futures . . . options . . . derivatives, swap contracts," and that participants would earn 15% annual returns on their investment. Defendants

representation is false and misleading because the fund is not engaged in any transactions in digital currencies or otherwise that are returning profits to participants. *Id.*

Finally, Defendants falsely misrepresent that participants' principal investment would not be lost, that Rose City was generating a 48% yield, and that the fund's management fee was 2%. These statements are also false. First, participants' principal investments were used to pay other participants' monthly "gains," as detailed below. Without question, when a portion of a new participants' initial investment is used to pay another participants' monthly gains, that principal investment is lost. *See* (Dasso Decl. ¶ 33, 43, 44.) Second, Rose City never generated a 48%--or any—yield. *See* (Dasso Decl. ¶¶ 23, 28, 29, 33, 45.) In fact, the Rose City and Seneca Ventures' bank accounts reveal that the funds never generated any returns. *Id.* Finally, Defendants Ikkurty and Avadhanam paid themselves in excess of the 2% management fee represented in the Agreement. Two percent of $44 million is $880,000, however, Defendants Ikkurty and Avadhanam transferred tens of millions of dollars into accounts they own and control. (Dasso Decl. ¶¶ 24, 30, 33, 38, 39, 49, 50.)

### C.    The Misappropriation

During the Relevant Period, Defendants accepted at least $44 million from at least 170 participants into various bank accounts in the names of Rose City and/or Seneca Ventures. As detailed below, Defendants misappropriated participant funds because instead of investing them as a pool and providing participants with profits from their investments, Defendants distributed participants funds to (i) other participants in the manner of a Ponzi scheme, (ii) entities owned and controlled by Defendants, and (iii) to an off-shore entity that is associated with a crypto exchange that does not allow US persons to transact.

Of the more than $44 million Defendants accepted from participants during the Relevant Period, they transferred more than half to other participants and to entities they own and control. Defendants also transferred approximately $18 million to an off-shore entity that is associated with a cryptocurrency exchange that does not allow US persons.

### D.     Seneca Ventures' Accounts

Shortly after Defendants Ikkurty and Avadhanam formalized Rose City and established Seneca Ventures, they began opening bank accounts for both entities.  On April 15, 2021, Defendant Avadhanam opened a business checking account for Seneca Ventures with Bank A. (Dasso Decl. ¶ 20.)  Avadhanam was the only signer for this account.  *Id*.  Between April 15, 2021 and June 4, 2021, Defendant Ikkurty and Avadhanam accepted deposits of $1,707,000 from 24 participants into Seneca Ventures' Bank A account.  (Dasso Decl. ¶ 22.)  According to memos on some of the participants' wire deposits, the funds were for, among other things, "investment," "investment Rose City," "Rose City Fund II," and "ATTN: Ravishankar Avadhanam, Sam."  *Id.*

Between April 15, 2021, and June 4, 2021, Defendants Ikkurty and Avadhanam did not transfer funds from Bank A to buy, sell, or trade digital assets or any other instruments.  Rather, during that time period, Defendants Ikkurty and Avadhanam transferred $1,686,829 of participant funds to other accounts under the control of and for the benefit of the Defendants. (Dasso Decl. ¶ 24.)  Other than two deposits by the Defendants Ikkurty and Avadhanam totaling $36,666, Seneca Ventures did not receive any deposits into the Bank A account other than participant funds, *i.e.*, no profits from purported investments were deposited into the Bank A account.  (Dasso Decl. ¶ 23.)  Seneca Ventures' Bank A account was closed in June 2021. (Dasso Decl. ¶ 25.)

In sum, in the less than two months that Seneca Ventures used an account at Bank A, Defendants accepted $1,707,000 from 24 participants, transferred out $1,686,829 of participant funds to other accounts under the control of and for the benefit of the Defendants, and received no deposits in the nature of income, profits or earnings of any sort.

Shortly thereafter, on June 14, 2021, Defendants Ikkurty and Avadhanam opened a business checking account with Bank B in the name of Seneca Ventures. (Dasso Decl. ¶ 26.) In so doing, Seneca represented itself to be a "technology consulting firm in software programming." *Id.* Ikkurty and Avadhanam are both signers on Seneca Ventures' account at Bank B. *Id.* Between June 2021 and January 2022, Defendants Ikkurty and Avadhanam accepted deposits of at least $10,400,000 from at least 122 participants into the Seneca Ventures account at Bank B. (Dasso Decl. ¶ 28.) According to memos on these wires, the funds were for the purpose of "investment", "initial investment" and "additional investment." *Id.*

During this period, Defendants Ikkurty and Avadhanam did not transfer any funds from Bank B to a trading account at any "exchange" or dealer. (Dasso Decl. ¶ 30.) Rather, during that time period, Defendants Ikkurty and Avadhanam transferred $25,000 of participant funds to other participants and at least $9,916,333 of participant funds to other accounts under the control of and for the benefit of the Defendants. *Id.* The only deposits into Seneca Ventures' Bank B account during this time period were participant funds and funds from other accounts owned and controlled by Defendants, *i.e.*, the account did not receive any profits from purported investments into this account. (Dasso Decl. ¶¶ 28,29.) Bank B was closed in January 2022. (Dasso Decl. ¶ 30.)

In sum, in the approximately six months that Seneca Ventures used the account at Bank B, Defendants accepted at least $10,400,000 from at least 122 participants and transferred out at

least $9,916,333 to other accounts under the control of and for the benefit of the Defendants, another $25,000 to other participants, and received no deposits in the nature of income, profits or earnings.

In December 2021, Defendants Ikkurty and Avadhanam opened an account for Seneca Ventures at Bank C. (Dasso Decl. ¶ 32.) Between December 2021 and the present, Defendants accepted $5,400,000 of funds into this account. (Dasso Decl. ¶ 33.) The account at Bank C remains open. (Dasso Decl. ¶ 34.)

### E. Rose City's Accounts

In addition to accounts in Seneca Ventures' name, Defendant Ikkurty also opened bank accounts for Rose City. On May 18, 2021, Proposed Defendant Ikkurty opened a business bank account for Rose City at Bank D. (Dasso Decl. ¶ 35.) According to the account opening application, the purpose of the account is "trading" and the anticipated account activity was "Funds In/Out from Operating Account (LP Subscriptions)/ wires to/from exchanges (Coinbase Pro) to buy crypto assets." *Id.* Defendants further described the types of transactions as "[f]unds in from selling limited partnership interests . . ." *Id.* Ikkurty is the only Principal/Officer and authorized signer on the account. *Id.*

Between May 18, 2021 and March 31, 2022, Defendants Ikkurty and Avadhanam accepted at least $32,307,846 from at least 78 participants into the Rose City account at Bank D. (Dasso Decl. ¶ 37.) In addition, during this same period, at least $10,621,162 of participant funds from the Seneca Ventures accounts at Banks A and B were transferred to the Rose City account at Bank D. (Dasso Decl. ¶ 38.)

Defendants Ikkurty and Avadhanam transferred funds out of the Rose City Bank D account to: (i) other participants, (ii) accounts under the control of and for the benefit of the

Proposed Defendants, and (iii) an off-shore entity associated with a purported crypto exchange that does not allow US persons.[2] First, between, May 18, 2021 and March 31, 2022, Defendants Ikkurty and Avadhanam transferred approximately $5,846,720 of participant funds to other participants. (Dasso Decl. ¶ 43.) Two examples of participant deposits and distributions are demonstrative.

- Customer A deposited $300,000 into Rose City's account at Bank D on September 30, 201. Subsequently, Customer A received their guaranteed annual return on investment of 15%, paid monthly. Specifically, Customer A received disbursements of $3,750 on November 16, 2021, December 14, 2021, January 20, 2022, February 7, 2022 and March 22, 2022. No deposits from any cryptocurrency exchange indicative of any trading "profits" ever came into the Rose City Bank account.

- Customer B deposited $500,000 into Rose City's account at Bank D on October 22, 2021. Subsequently, Customer B received their guaranteed annual return on investment of 15%, paid monthly. Specifically, Customer B received disbursements of $6,250 on December 14, 2021, January 20, 2022, February 7, 2022 and March 22, 2022. No deposits from any cryptocurrency exchange indicative of any trading "profits" ever came into the Rose City Bank account.

(Dasso Decl. ¶ 44.)

Second, between May 18, 2021 and March 31, 2022, Defendants Ikkurty and Avadhanam transferred at least $23,908,892 of participant funds from the Rose City account to an account

---

[2] The off-shore entity is a Singapore entity whose stated principal business activity is "information technology and computer service activities." A purported crypto exchange states in its privacy policy that the exchange "shall mean and include" the off-shore entity. The exchange's website states that it does "not support US customers."

belonging to Jafia, and at least $860,502 to an account belonging to Seneca Ventures at Bank B. (Dasso Decl. ¶ 39.)  Third, during the same time period, Rose City transferred $9.2 million to an off-shore entity.  (Dasso Decl. ¶ 40.)  Rose City's bank records do not include any deposits from the off-shore entity that could be "profits" from any investment.  *Id.*

### F.     Jafia Account

Defendants also accepted participant funds into an account in Jafia's name.  On or about August 24, 2020, Defendant Ikkurty opened an account for Jafia, at Bank E in Portland, Oregon. (Dasso Decl. ¶ 47.)  Between July 2021 and March 31, 2022, Defendant Ikkurty accepted at least $23,908,802 into the Bank E account.  (Dasso Decl. ¶ 49.)  During the Relevant Period, Defendant Ikkurty transferred over $6.5 million from the Jafia account to other accounts under the control of and for the benefit of the Defendants.  (Dasso Decl. ¶ 50.)  Defendants Ikkurty and Jafia transferred $8,650,000 to the off-shore entity.  (Dasso Decl. ¶ 51.)

## V.     ARGUMENT

### A.  Defendants Failed to Register with the CFTC as a CPO in Violation of Section 4m(1) of the Act

Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2018), in relevant part, makes it unlawful "for any commodity trading advisor or commodity pool operator, unless registered under this chapter, to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as such commodity trading advisor or commodity pool operator. . . ."

Section 1a(10) of the Act, 7 U.S.C. § 1a(10) (2018), defines the term "commodity pool" to mean "any investment trust, syndicate, or similar form of enterprise operated for the purpose of trading in commodity interests, including any—(i) commodity for future delivery, security futures product, or swap; (ii) agreement, contract, or transaction described in section

15

2(c)(2)(C)(i) or section 2(c)(2)(D)(i); (iii) commodity option authorized under section 4c; or

(iv) leverage transaction authorized under section 19."

Section 1a(11) of the Act defines a CPO as, among other things, any person engaged in a

business that is of the nature of a commodity pool and who solicits, accepts, or receives from

others, funds, securities, or property for the purpose of trading commodity interests.

The Defendants have never been registered with the CFTC in any capacity.

Nevertheless, during the Relevant Period, Defendants solicited participants to participate in their

fund through at least their website, a YouTube Video and the Partnership Agreement. Also,

Defendants accepted participant funds through wire transfers into bank accounts at Banks A-E,

during the Relevant Period. Therefore, Defendants made "use of mails or any means or

instrumentality of interstate commerce in connection with" their fund. Defendants accepted at

least $44 million from participants for the purpose of buying, selling, holding and trading in

futures contracts. Participants' wire transfers memos indicate that the purpose of sending their

funds to Relief Defendants Rose City and Seneca Ventures was to "invest" in Rose City's fund.

Rose City's Partnership Agreement explicitly solicits participants based on representations that

the partnership is empowered to "purchase, hold, sell, sell short and otherwise deal in

commodities, commodity contracts, commodity futures, financial futures (including index

futures) and options in respect thereof," among other products. Defendants therefore engaged in

a business that is of the nature of a commodity pool and accepted money from participants for

the purpose of trading commodity interests without being registered with the CFTC and therefore

violated Section 4m(1) of the Act, 7 U.S.C. § 6m(1).

**B. Defendants Committed Fraud as a Commodity Pool Operator in Violation of
Section 4o(1)(A) and (B) of the Act**

### 1. Defendants Engaged in CPO Fraud

Section 4*o*(1)(A) and (B) of the Act provides, in relevant part, that it is unlawful for a

CPO, by use of the mails or any other means of interstate commerce, directly or indirectly, to:

(A) employ any device, scheme, or artifice to defraud any participant; or (B) engage in any

transaction, practice, or course of business that operates as a fraud or deceit upon any participant.

"Section 4*o*(1) of the Act broadly prohibits fraudulent conduct by a [CTA]" and "applies to all

[CTAs] whether registered, required to be registered, or exempted from registration." *CFTC v.*

*Weinberg*, 287 F. Supp. 2d 1100, 1107-08 (C.D. Cal. 2003) (citing *Skorupskas*, 605 F. Supp. at

932; *see also CFTC v. Vartuli*, 228 F.3d 94, 103 (2d Cir. 2000) (finding unregistered CTA liable

under Section 4*o* of the Act); Commission Regulation 4.15, 17 C.F.R. § 4.15 (2019) ("The

provisions of Section 4*o* of the Act shall apply to any person even though such person is exempt

from registration under this Part 4, and it shall continue to be unlawful for any such person to

violate Section 4*o* of the Act.").

Defendants violated Section *4o*(1)(B) by (1) making material misrepresentations,

misleading statements and omissions, and (2) misappropriating participants funds. *See*

*Skorupskas*, 605 F. Supp. at 932 ("misappropriation of participants' funds which had been

entrusted . . . for trading purposes is a violation of both §§ 4b[a] and 4*o*(1)."); *see also Stotler &*

*Co. v. CFTC*, 855 F.2d 1288, 1290-91 (7th Cir. 1988) (the same fraudulent conduct that violates

Section 4b of the Act also violates Section 4*o*(1) of the Act); *CFTC v. R.J. Fitzgerald & Co.,*

*Inc.*, 310 F.3d 1321, 1328 (11th Cir. 2002) (to establish liability for fraud based on

misrepresentations and omissions under Section 4b(a) of the Act, the CFTC must prove: (1) a

misrepresentation, misleading statement, or omission was made; (2) with scienter; and (3) that

the misrepresentation, statement or omission was material) (citations omitted). To establish a

17

violation of Section 4*o*(1)(B) of the Act, the Commission must prove (1) a misrepresentation, misleading statement, or omission was made, and (2) that the misrepresentation, statement or omission was material. *See R.J. Fitzgerald & Co., Inc.*, 310 F.3d at 1328. Under Section 4*o*(1)(B) of the Act, the Commission is not required to prove scienter to establish a violation of Section 4*o*(1)(B). *See Commodity Trend Serv. v. CFTC*, 233 F.3d 981, 993 (7th Cir. 2000) ("This language [in Section 4*o*(1)(B)] focuses upon the effect a CTA's conduct has on its investing participants rather the CTA's culpability, and so does not require a showing of scienter."); *Messer v. E.F. Hutton & Co.*, 847 F.2d 673, 677 (11th Cir.1988); *CFTC v. Savage*, 611 F.2d 270, 285 (9th Cir. 1980).

### a. Defendants Committed Fraud by Making Misrepresentations and Omissions

Defendants operated a fraud and deceit upon participants by making misrepresentations and omissions of material fact. "Whether a misrepresentation has been made depends on the 'overall message' and the 'common understanding of the information conveyed.'" *R.J. Fitzgerald*, 310 F.3d at 1328 (citing *Hammond v. Smith Barney Harris Upham & Co.*, CFTC No. 86-R131, 1990 WL 282810, at *4, n.12 (Mar. 1, 1990)). In doing so, alleged misrepresentations or omissions should be given the meaning usually accorded them by an "objectively reasonable" person. *Id*. at 1329 (finding that statements predicting specific profits and downplaying future opportunities to make such profits were deceptive and misleading).

Defendants willfully made false and misleading representations to participants, including that 70% of the fund's assets are invested in proof-of-stake mining coins and also that fund "earns" income from these assets; that the fund will "invest, hold and trade in digital currencies," "purchase, hold, sell, sell short and otherwise deal in commodities, commodity contracts, commodity futures, financial futures . . . options . . . derivatives, swap contracts," and that

18

participants would earn 15% annual returns on their investment; and that participants' principal investment would not be lost, that Rose City was generating a 48% yield, and that the fund's management fee was 2%. These representations are false.

To begin, it is clear that neither Rose City nor Seneca Ventures is holding "70% of its assets" in "proof-of-stake mining coin" that generate any income for the fund. This is evident because the funds' bank records demonstrate that participants funds remain in cash in the funds' bank accounts. Moreover, there are no "profits" or "income" earned on these funds. Next, Defendants have not generated 15% annual returns—or any returns—because the fund is not engaged in in any transactions in digital currencies or otherwise that are returning profits to participants. Finally, it is demonstrably false that participants' principal investment would not be lost, that Rose City was generating a 48% yield, and that the fund's management fee was 2%. These statements are false because participants' principal investments were used to pay other participants' monthly "gains," and thus lost; Rose City never generated a 48%--or any—yield; and, Defendants Ikkurty and Avadhanam paid themselves in excess of the 2% management fee represented in the Agreement.

In addition to Defendants' misrepresentations, Defendants also omitted to disclose to participants that they were transferring their funds to other participants, to themselves and to an off-shore entity.

**b. Defendants' Misrepresentations and Omissions Are Material**

Defendants' misrepresentations and omissions are material. A misrepresentation or omission is material if a reasonable investor would have viewed the misrepresentation or omission as "having significantly altered the total mix of information made available." *Basic, Inc. v. Levinson*, 485 U.S. 224, 232 (1988)). "[M]ateriality ... covers whatever is important

19

enough to reasonable participants in an investment decision to alter their behavior." *SEC v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998); *see also CFTC v. Gramalegui*, No. 15-cv-02313-REB-GPG, 2018 WL 4610953, at *19 (D. Co. Sept. 26, 2018) ("Misrepresentations of profit plainly are material."); *Noble Wealth Data Info. Servs., Inc.*, 90 F. Supp. 2d 676, 686 ("Misrepresentations concerning profit and risk go to the heart of a participant's investment decision and are therefore material as a matter of law." (citing *CFTC v. Commonwealth Fin. Grp.,* 874 F. Supp. 1345, 1353 (S.D. Fla. 1994)).

Defendants' misrepresentations and omissions are material because a reasonable investor would have viewed them as significant in deciding whether to invest in the funds. Defendants misrepresented what they would do with participants' capital, that the fund was already invested in digital assets, the fund's historical performance, the risk of participants' loss of their initial capital contribution and also Defendants' compensation for their services. Moreover, Defendants omitted to disclose to their participants that they were transferring their funds to other participants, to themselves and to an off-shore entity.

### c. Defendants Committed Fraud by Misappropriating Client Funds

"Misappropriation of [investor] funds constitutes 'willful and blatant' fraud in violation of Section 4b(a) of the Act." *CFTC v. Flint McClung Capital LLC*, No. 11-cv-01644-CMA-BNB, 2012 WL 639321, at *8 (D. Co. Feb. 28, 2012) (granting default judgment and permanent injunction) (quoting *Noble Wealth Data Info. Servs.,* 90 F. Supp. 2d at 687; *see also CFTC v. Morse*, 762 F.2d 60, 62 (8th Cir. 1985) (defendant's use of participant funds for personal use violated Section 4b of the Act); *see also CFTC v. Noble Wealth*, 90 F.Supp.2d 676, 687 (D. Md. 2000) (Proposed Defendants violated Section 4b(a)(2)(i) and (iii) (the predecessor to 4b(a)(2)(A) and (C)) by diverting investor funds for operating expenses and personal use); *CFTC v.*

*Skorupskas*, 605 F.Supp. 923, 932 (E.D. Mich. 1985) (defendant violated Section 4b when she misappropriated pool participant funds by soliciting funds for trading and then trading only a small percentage of those funds, while disbursing the rest to investors, herself, and her family).

Defendants misappropriated participant funds by transferring them to (i) other participants, (ii) accounts held in the name of or for the benefit of Defendants, and (iii) to an off-shore entity that may be associated with a crypto exchange. The exchange explicitly does not support US persons on the platform. Without question, misappropriating participant funds to their own accounts and to other participants instead of investing them constitutes a violation of Section 4*o* of the Act.

During the Relevant Period, the Defendants received approximately $44 million in deposits from at least 170 participants. Participant deposits were received by Relief Defendants Rose City and Seneca Ventures. As detailed above, Defendants transferred participants funds to other participants. Defendants also transferred, approximately tens of millions of dollars of participant funds to entities under their control. And, during the Relevant Period Defendants transferred approximately $18 million to an off-shore entity that did not generate any income, return or gain for the fund. Thus, Defendants misappropriated participant funds to other participants, their own accounts and to an off-shore entity instead of investing them in the pool, which constitutes a violation of Section 4*o* of the Act.

## C. Defendants Violated Section 6(c)(1) of the Act and Regulation 180.1(a)

Section 6(c)(1) of the Act makes it unlawful for any person, directly or indirectly, in connection with any contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, intentionally or recklessly: (1) used or employed, or attempted to use or employ, manipulative devices, schemes, or artifices

21

to defraud; (2) made, or attempted to make, untrue or misleading statements of a material fact or omitted to state material facts necessary in order to make the statements made or not untrue or misleading; or (3) engaged, or attempted to engage, in acts, practices, or courses of business, which operated or would have operated as a fraud or deceit upon clients or prospective clients.

Regulation 180.1(a) provides, in relevant part, that it shall be unlawful for any person, directly or indirectly, in connection with any contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly: (1) use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) make , or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; or (3) engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.

Defendants violated Section 6(c)(1) of the Act and Regulation 180.1(a)(1)-(3) because they engaged in the conduct described above intentionally. The same conduct that violated Section 4*o* also violated Section 6(c)(1) and Regulation 180.1(a)(1)-(3) Defendants violated Section 6(c)(1) and Regulation 180.1(a)(1) by misappropriating client funds intended to be used to invest and trade in cryptocurrencies. This type of misappropriation falls squarely within the Act and Regulations and has been recognized as a violation subject to an enforcement action. *See CFTC v. McDonnell*, 332 F. Supp. 3d 717, 723 (E.D.N.Y. 2018) (holding Section 6(c)(1) and Regulation 180.1(a) were violated by misappropriating funds and fraudulent misrepresentations in connection with virtual currency transactions); *CFTC v. Leben*, No. 3:14-cv-866, 2016 WL

22

7354359, at *5 (D.S.C. Aug. 5, 2016) (finding that the Proposed Defendants violated Section 6(c)(1) by misappropriating funds).

Defendants misappropriated participant funds with the requisite scienter. The scienter element is established when an individual's acts are performed "with knowledge of their nature and character." *Wasnick v. Refco, Inc.*, 911 F.2d. 345, 348 (9th Cir. 1990) (internal quotation marks and citation omitted). The CFTC need not prove evil motive or intent to injure a client, or that a defendant wanted to cheat or defraud prospective clients. *Cange v. Stotler & Co. Inc.*, 826 F.2d 581, 589 (7th Cir. 1987). In order to meet the scienter requirement, the CFTC must demonstrate that a defendant committed the alleged wrongful acts "intentionally or with reckless disregard for his duties under the Act." *Drexel Burnham Lambert, Inc. v. CFTC*, 850 F.2d 742, 748 (D.C. Cir. 1988) (finding that recklessness is sufficient to satisfy scienter requirement); *McCarthy v. PaineWebber, Inc.*, 618 F. Supp. 933, 940 (N.D. Ill. 1985). To prove that conduct is intentional, the Commission need only show that a defendant's actions were "intentional as opposed to accidental." *Lawrence v. CFTC*, 759 F. 2d 767, 773 (9th Cir. 1985). To prove that conduct is reckless, the CFTC must show that it "departs so far from the standards of ordinary care that it is very difficult to believe the [actor] was not aware of what he was doing." *Drexel Burnham Lambert*, 850 F.2d at 748 (alteration in original) (internal quotation marks and citation omitted); *see also McCarthy*, 618 F. Supp. at 940 (holding that recklessness is sufficient to satisfy the scienter requirement).

Defendants acted with the requisite scienter because their material misrepresentations, omissions and false statements were not accidental. Defendants published their misrepresentations on their website, in YouTube videos, and memorialized them in the Partnership Agreement. Defendants transferred new participant funds to other participants in the

23

precise amount (15%) promised through their solicitations. Defendants transferred participant funds to accounts they own and control. Defendants transferred participant funds to an off-shore entity. Defendants' accounts show no returns, gains or profits of any sort. Defendants' conduct was not accidental but intentional, and thus satisfies the element.

### Relief Defendants Received Funds to Which They Have No Legitimate Interest

Relief Defendants are in possession of at least $7.5 million in participant funds. The broad equitable powers of the federal courts can be employed to recover ill-gotten gains for the benefit of the victims of wrongdoing, whether held by the original wrongdoer or by one who has received the proceeds after the wrong. *See CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 193 (4th Cir. 2002) (holding the district court had the authority to freeze ill-gotten gains held by relief defendants for possible later disgorgement); *SEC v. Zufelt*, No. 2:10-cv-574-DB-DBP, 2016 WL 5404746, at *6 (D. Utah Aug. 8, 2016) (magistrate report and recommendation finding that quit-claim transaction resulted in a third party's possession of ill-gotten gains), *adopted*, 2016 WL 5407623 (D. Utah Sept. 27, 2016).

## VI.     RELIEF SOUGHT

### A. The Act Authorizes an *Ex Parte* Statutory Restraining Order Freezing the Defendants' Assets and Prohibiting the Destruction of Books and Records

Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2012), authorizes the CFTC to seek injunctive relief when it appears that a person or entity has engaged, is engaging, or is about to engage in any act or practice that violates the Act, and it specifically authorizes restraining orders prohibiting persons from "withdrawing, transferring, removing, dissipating, or disposing of any funds, assets, or other property" and from "destroying, altering or disposing of, or refusing to permit authorized representatives of the Commission to inspect, when and as requested, any books and records or other documents," even on an *ex parte* basis. Section 6c(b) of the Act,

24

7 U.S.C. § 13a-1(b) (2012) provides that "[u]pon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond."

To make a proper showing, the CFTC "need not prove irreparable injury or the inadequacy of other remedies as required in private injunctive suits. A prima facie case of illegality is sufficient." *CFTC v. Muller*, 570 F.2d 1296, 1300 (5th Cir. 1978). "It has long been recognized that in an action brought to enforce the requirements of remedial statutes such as [the Act], a district court has broad discretion to fashion appropriate relief." *Id.* at 1300 (upholding injunction prohibiting defendant from concealing or disposing of assets).

An *ex parte* Statutory Restraining Order is appropriate and necessary, as the facts described above establish a "prima facie case of illegality," including that Defendants defrauded participants.

**B. The CFTC Has Established a Prima Facie Case of Illegality Against Defendants and The Court Should Issue an *Ex Parte* Statutory Restraining Order**

Immediate injunctive relief is necessary because Defendants are likely to further dissipate or shield fraudulently-obtained assets. Pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2018) the CFTC seeks an *ex parte* Statutory Restraining Order that freezes Defendants' and Relief Defendants' assets and prohibits the destruction of, or prevention of CFTC access to, Defendants' books and records and appoints a Temporary Receiver. The Commission is likely to prevail on the merits. As explained above and in the Complaint, the Commission has made a *prima facie* showing that Defendants violated core anti-fraud provisions of the Act.

In its accompanying Emergency Motion for an Ex Parte Statutory Restraining Order, the CFTC moves the Court to enter a Statutory Restraining Order without notice preventing the Defendants from engaging in the following conduct: (1) withdrawing, transferring, removing, dissipating, or disposing of any funds, assets, or other property; (2) destroying, altering,

25

mutilating, or disposing of any books, records, or other documents; and (3) refusing to permit

authorized representatives of the CFTC to inspect, when and as requested, any books, records, or

other documents. This relief, authorized by Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2012),

is necessary in this case in light of the evidence that Defendants have lied to customers for years

about their investments and transferred their funds to themselves, other customers and off-shore.

Accordingly, the Court should issue an *ex parte* statutory restraining order to preserve the status

quo and protect the public from further loss and to prevent the Defendants' assets from being

further dissipated. *See e.g., CFTC v. Schroeder*, 2006 WL 3692481 (W.D. Mich. Sept. 27,

2006)(issuing a statutory restraining order to prevent dissipation of assets); *CFTC v. Marquis*

*Management Systems, Inc.*, 2003 WL 23190193 (E.D. Mich. October 20, 2003)(same).

### C. The Appointment of a Receiver is Necessary to Protect the Public Interest

Whether a receiver shall be appointed is a matter within the sound discretion of the court.

*See FTC v. A1 Janitorial Supply Corp.*, 2020 WL 887386, at * (N.D. Ill. Feb. 24, 2020) ("district

courts enjoy broad discretion to appoint an equity receiver and to supervise administration of the

receivership"); *see also CFTC v. Morgan, Harris & Scott, Ltd.*, 484 F. Supp. 669, 677 (S.D.N.Y.

1979); *CFTC v. Am. Metals Exch. Corp.*, 693 F. Supp. 168, 172 (D.N.J. 1988; *CFTC v. Am.*

*Commodity Grp. Corp.*, 753 F.2d 862, 866 (11th Cir. 1984. Indeed, courts may exercise their

equitable powers to appoint a *temporary* receiver in the absence of service, especially where the

giving of notice would defeat the very purpose of the receivership. *See Arkansas Louisiana Gas*

*Co. v. Kroeger*, 303 F.2d 129, 132 (5th Cir. 1962) ("[A] court of equity does have the power and

authority to make an *ex parte* appointment of a receiver.") (citations omitted)

Good cause exists for the appointment of a Temporary Receiver, in a capacity as the agent of

this Court, to take control of all assets owned, controlled, managed or held by, or on behalf of, or

26

for the benefit of Defendants in order to preserve assets, investigate and determine clients' claims, determine unlawful proceeds retained by Defendants and amounts due to clients as a result of Defendants' alleged violations, and, eventually, distribute remaining funds under the Court's supervision.[3] *E.g.*, *CFTC v. Co. Petro Mktg. Corp.*, 680 F.2d 573, 582–83 (9th Cir. 1982) The CFTC seeks these forms of relief in its Motion for an *ex parte* Statutory Restraining Order.

### D. Thereafter, the Court Should Enter an Order of Preliminary Injunction

To make a proper showing that injunctive relief is merited under Section 7 U.S.C. § 13a-1(a), the CFTC must show that a person violated, and is likely to continue violating, the Act, the latter of which "may be inferred from past unlawful conduct." *CFTC v. British Am. Commodity Options Corp.,*560 F. 2d 135, 142 (2d Cir. 1977); *see also CFTC v. Sidoti*, 178 F. 3d 1132, 1137 (11th Cir. 1999) (finding no abuse of discretion in permanently enjoining further violations "[i]n light of the likelihood of future violations"). The "unqualified grant of statutory authority to issue an injunction under § 13a-1 [of the Act] carries with it he full range of equitable remedies." *CFTC v. Wilshire Inv. Mgmt. Corp.,* 531 F. 3d 1339, 1344 (11th Cir. 2008) (holding restitution is authorized even though not specifically enumerated in Section 6c of the Act); *Muller,* 570 F. 2d at 1300 (upholding injunction prohibiting defendant from concealing or disposing of assets).

Pursuant to 7 U.S.C. § 13a-1(a) (2018), the CFTC seeks relief in its Motion for a Preliminary Injunction that would continue the relief granted by the Statutory Restraining Order it seeks and bar further violations of the Act. Such injunctive relief is appropriate in this case because the ongoing nature of Defendants' serious fraudulent conduct is highly suggestive of

---

[3] The CFTC specifically recommends that the Court approve the appointment of James Kopecky as the Temporary Receiver in this matter and submits his *curriculum vitae* to the Court for consideration. [Ex. 2, Kopecky CV]

future violations of the Act.  The gravamen of the Complaint is that the Defendants committed

fraud in violation of Sections 4*o*(1)(A) and (B) and 6(c)(1) of the Act, and also that they failed to

register as a CPO in violation of Section 4m(1) of the Act.  In reversing the denial of a

preliminary injunction, the Seventh Circuit has held that "[a]ctions for statutory injunctions need

not meet the requirements for an injunction imposed by traditional equity jurisprudence.  Once a

violation is demonstrated, the moving party need show only that there is some reasonable

likelihood of future violations. (citations omitted). While past misconduct does not lead

necessarily to the conclusion that there is a likelihood of future misconduct, it is 'highly

suggestive of the likelihood of future violations.'"  *CFTC v. Hunt,* 591 F. 2d 1211, 1220 (7th Cir.

1979) (citations omitted).

The CFTC has demonstrated that Defendants violated Section 4*o*(1)(A) and (B) of the

Act, 7 U.S.C. § 6*o*(1)(A) and (B)(2018), Section 6(c)(1) of the Act and Regulation 180.1, 7

U.S.C. § 9(1), 17 C.F.R. § 180.1(a), and also that they failed to register as a CPO in violation of

Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2018).  Thus, this Court should enter an Order of

Preliminary Injunction.

## VII.   CONCLUSION

In light of the strong likelihood of ongoing fraud committed by Defendants and the need

to protect their customers, the CFTC respectfully requests the Court to enter an *ex parte*

Statutory Restraining Order, Appoint a Temporary Receiver and enter a Preliminary Injunction

against Defendants Ikkurty, Avadhanam, Jafia, and Relief Defendants Rose City I, Rose City and

Seneca Ventures that prohibits them from:  (1) withdrawing, transferring, removing, dissipating,

or disposing of any funds, assets, or other property; (2) destroying, altering, mutilating, or

disposing of any books, records, or other documents; and (3) refusing to permit authorized

28

representatives of the CFTC to inspect, when and as requested, any books, records, or other documents.

Date: May 10, 2022

Respectfully submitted,

/s/Candice Haan
Candice Haan
ARDC #6315007
Senior Trial Attorney
U.S. Commodity Futures Trading
Commission
77 West Jackson Boulevard, Suite 800
Chicago, Illinois 60604
(312) 596-0677
chaan@cftc.gov

/s/David Terrell
David Terrell,
Federal Bar No. 19-205
Chief Trial Attorney
U.S. Commodity Futures Trading
Commission
77 West Jackson Boulevard, Suite 800
Chicago, Illinois 60604
(312) 596-0539
dterrell@cftc.gov