## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

COMMODITY FUTURES TRADING
COMMISSION,

Plaintiff,

v.

SAM IKKURTY A/K/A SREENIV ASI
RAO, RAVISHANKAR AVADHANAM,
JAFIA LLC,

Defendants,

IKKURTY CAPITAL, LLC D/B/A
ROSE CITY INCOME FUND, ROSE
CITY INCOME FUND II LLP, AND
SENECA VENTURES, LLC,

Relief Defendants

Case No. 22-cv-02465

Judge Mary M. Rowland

## <u>MEMORANDUM OPINION AND ORDER</u>

The Commodity Futures Trading Commission (CFTC) accuses Defendants Sam
Ikkurty, Ravishankar Avadhanam,[1] and Jafia LLC of civil violations of the
Commodity Exchange Act (CEA). The CFTC seeks summary judgment and the
payment of restitution and disgorgement. Defendants Ikkurty and Jafia cross-move
for summary judgment. [267] [270] For the reasons stated below, the CFTC's motion
for summary judgment [267] is granted. Defendants' motion for summary judgment
and motion to dismiss is denied. [270].

---

[1] The case was dismissed as to Avadhanam on August 4, 2023, pursuant to an agreed consent order
reached between the CFTC and Avadhanam. [201-203].

1

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id*. After a "properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id*. at 250 (quoting Fed. R. Civ. P. 56(e)).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [ ] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (quotation omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (citing *Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.*

2

When cross-motions for summary judgment are filed, the Court construes all facts and draws all reasonable inferences in favor of the party against whom the motion was filed. *Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am.*, 849 F.3d 355, 361 (7th Cir. 2017). The Court treats the motions "separately in determining whether judgment should be entered in accordance with Rule 56." *Marcatante v. City of Chi.*, 657 F.3d 433, 439 (7th Cir. 2011). *See also Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 416 (7th Cir. 2019) ("Each cross movant for summary judgment bears a respective burden to show no issue of material fact with respect to the claim.").

## BACKGROUND[2]

### I.     Ikkurty Forms RCIF I and RCIF II

Ikkurty founded Jafia LLC in 2006 and is the company's sole officer, president, and registered agent. DSOF ¶ 3. In 2017, Ikkurty established Ikkurty Capital LLC and began to do business as Rose City Income Fund I (RCIF I). *Id.* ¶ 1. Ikkurty, through Jafia, served as the general partner for RCIF I, and later, in 2021, RCIF II. *Id.* ¶ 3. Ikkurty has not registered himself nor any of his business ventures with the CFTC. *Id.* ¶ 6.

Both RCIF I and RCIF II operated as limited partnerships, and Ikkurty referred to them as "crypto hedge funds." PSOF ¶ 2. Ikkurty had limited experience investing

---

[2] These facts are taken from Plaintiff CFTC's Rule 56.1 statements of fact [269] (PSOF), Defendants' statement of facts [272] (DSOF), Defendants' response to Plaintiff's statement of facts [339] (DRSOF), Plaintiff's response to Defendants' statement of facts, [343] (PRSOF), Defendants' statement of additional facts [340] (DSAF), and Plaintiff's response to Defendants' statement of additional facts (PRSAF) [353]. The facts are undisputed unless otherwise noted.

in cryptocurrencies before launching RCIF I: he bought 25-50 bitcoins for himself before his account was hacked in 2017. *Id.* ¶ 4. *Id.*; DSROF ¶ 4-5.

Three documents set out operative terms and conditions for the two funds: (1) a Private Placement Memorandum, a marketing document, (PPM), (2) a Limited Partnership Agreement, a contract between the general partner and the limited partners, (LPA), and (3) a Subscription Agreement and Valuation Policy. PSOF ¶¶ 6, 10. Ikkurty retained law firm Seward & Kissel to draft the documents for RCIF II. *Id.* Ikkurty also retained third-party vendor Intertrust Corporate and Fund Services LLC to act as fund administrator, though it had never administered a digital asset fund before. *Id.* ¶ 13. Lastly, Ikkurty told prospective participants that RCIF retained Richey May & Co. to audit the fund. *Id.* ¶ 14.

## II. Ikkurty's Communications with Prospective and Current Participants

Ikkurty recruited RCIF II participants through weekly webinars and trade shows. *Id.* ¶¶ 17-18. He told participants that the goal of RCIF II was to "earn income with exposure to crypto assets." *Id.* ¶ 21. RCIF marketing materials including the PPM, the fund website, and PowerPoint presentations prepared by Ikkurty promised participants a "steady distribution of 15% [annual income] per year," generated by fees on "digital tollbooths" and "proof of stake mining." PSOF ¶¶ 15-16, 22-23, 25. The PPM incorporated this promise for "period payments of net profit." *Id.* ¶ 24.

Ikkurty's presentations also advertised the alleged success of RCIF I as a reason for recruits to invest in RCIF II. *Id.* ¶ 31. Ikkurty calculated RCIF I's favorable historical returns using an Excel spreadsheet. *Id.* ¶ 32. He now admits that he

4

overstated many of the monthly figures that he input into his spreadsheet and later the PowerPoints. *Id.* This resulted in incorrect marketing statements. *Id.* For example, Ikkurty advertised to potential participants that $100 invested in RCIF I at its inception would have grown through October 2021 by 2,708%, to $2,808.44. *Id.* ¶ 39. CFTC fact witness Heather Dasso calculated that using accurate return records, $100 invested in RCIF I fund inception would have grown through October 2021 by 759%, to just $859. *Id.* Ikkurty does not admit that the CFTC's calculations are correct but affirms that he input incorrect numbers for many months. *Id.* ¶¶ 39-40. Ikkurty, per his own testimony, has "no idea" how or why he did so. *Id.* ¶ 40. Additionally, Ikkurty failed to update either his spreadsheet or the marketing PowerPoint to reflect heavy losses sustained by RCIF I from November 2021 through March 2022. *Id.* ¶¶ 41-42. In that period, the fund lost 98.99% of its aggregate returns. *Id.* ¶ 41. Still, Ikkurty continued to use the PowerPoint presentations reporting returns through October 2021. *Id.* ¶ 42.

Ikkurty told potential RCIF II investors that he would invest 65% of the fund in "stable proof-of-stake tokens." *Id.* ¶ 44. He also represented to them that he had proficient knowledge and skill to manage trading. *Id.* Ikkurty told prospective fund participants that trading Bitcoin allowed him to retire in 2017, though he worked as a subcontractor thereafter. *Id.* ¶¶ 47-48. Ikkurty solicited and accepted more than $44 million dollars from participants to participate in RCIF II. *Id.* ¶ 49.

RCIF II investors Keni Patel and Shawn Lemerise gave deposition testimony that each of these representations by Ikkurty was important to their investment in the

fund. Both believed that the 15% annual income they received came from the fund's "net profits," *id.* ¶ 50, crediting Ikkurty's assertion that he would create cryptocurrency "tollbooths." *Id.* ¶ 51. Ikkurty's statements about RCIF I's purported success influenced both Patel and Lemerise to believe that earlier participants' balances "increased tremendously over time." *Id.* ¶¶ 53. Both investors also believed Ikkurty had achieved success trading cryptocurrencies based on his knowledge and skill, and both invested in RCIF II in part because of this. *Id.* ¶¶ 55-56.

### III.    The Fund's Performance and RCIF Collapse

Ikkurty made investment decisions for RCIF II based solely on his own "qualitative judgment." PSOF ¶¶ 46, 59. He put almost 90% of RCIF investments into a cryptocurrency called OHM. *Id.* ¶ 45. Ikkurty admits that OHM was not stable in 2021 through early 2022. *Id.* He also invested RCIF II funds into cryptocurrency Ethereum, as well as WBTC, a digital asset that represented the value of Bitcoin. DSOF ¶ 36.

In the end, Defendants did not return any net profits to participants. PSOF ¶ 28. Defendants instead redistributed later investors' contributions to earlier investors. *Id.* ¶¶ 29-30. Defendants' counsel ultimately revised the PPM to remove the description of monthly distributions as "net profit," but Ikkurty decided not to inform fund participants of this change. *Id.* ¶¶ 8-9, 15, 61.

Jafia developed two additional instruments for participants to invest in: a crypto savings note (CSN) and a carbon offset bond (COB). Both instruments functioned as promissory notes requiring Jafia to make monthly interest payments to the participant and repay the principal in full at the end of the term. *Id.* ¶ 62. The main

6

difference between these two products was that COBs were advertised as collateralized securities, while CSNs were not supported by collateral. *Id.* ¶ 63. Ikkurty advertised that 80% of contributions to CSNs and COBs would be invested in "stable proof of stake" tokens, i*d.* ¶ 64, and that purchasers would receive interest payments of 18% per year. *Id.* ¶ 63. Instead, Ikkurty wound up investing the bulk of CSN funds into cryptocurrencies OHM and Klima. *Id.* ¶ 64. He offered the same digital wallet address as collateral for dozens of COB purchasers. *Id.* ¶ 67-68. He also advertised that he would use an additional 8% of CSN funds to buy "put option protection," but did not do so. *Id.* ¶ 65.

RCIF I began to lose value rapidly in November 2021. *Id.* ¶ 41. In December 2021, Ikkurty offered RCIF I participants buyouts or COBs. In total, Jafia paid $29,075,645.65 in cash and COBs to RCIF I participants for stakes that would have been worth $7,682,406.80 if the participants had been required to cash out at the prices at the end of the month. *Id.* ¶ 72. The CFTC alleges that Ikkurty provided buyouts to participants based on the value of their positions in October and November, not December 2021 when the buyouts took place. *Id.* ¶ 70. The CFTC also alleges that Ikkurty used COB interest payment funds to pay for the buyouts. *Id.* ¶ 72.

At the time that Jafia's accounts were frozen, the principal payments for $6,036,500 in CSNs and $20,080,255 in COBs remained outstanding, though Jafia only held $5.9 million in assets. *Id.* ¶ 73. An expert witness hired by Defendants reviewed the fund accounts and identified millions of dollars in digital asset and

token holdings. DSOF ¶ 57. RCIF I participants who remained in the fund until its end in March 2022 contributed a total of $9,573,705 that was not returned to them. *Id.* ¶ 75. RCIF II participants who remained in that fund through its end in April 2022 contributed a total of $48,066,789 that was not returned to them in the form of distributions or withdrawals. *Id.*

## ANALYSIS

The CFTC and Defendants cross-move for summary judgment on the complaint's three counts: failure to register as a commodity pool operator (Count I), fraud by a commodity pool operator (Count II), and a deceptive scheme or contrivance (Count III). The parties' cross-motions are mirror images of each other – that is, Defendants' arguments against the CFTC's motion for summary judgment also constitute their arguments for summary judgment and vice versa. The Court will first address Defendants' contention that the Court lacks subject matter jurisdiction. Then, the Court will turn to the parties' respective arguments for summary judgment on each count.

## I. This Court Has Subject-Matter Jurisdiction

As an antecedent to their argument for summary judgment, Defendants move to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1) or 12(c). Defendants contend that they did not trade in "commodity interests," nor in contracts for the sale of "commodities." As such, Defendants argue, their conduct is not subject to regulation by the CFTC, and this Court thus lacks subject matter jurisdiction.

There is no question that this Court has subject matter jurisdiction. The CFTC brought the pending claims under the Commodity Exchanges Act, giving this Court

federal question jurisdiction. 28 U.S.C. § 1331. "[J]urisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (quoting *Bell v. Hood*, 327 U.S. 678, 682 (1946)). Rather, the district court retains jurisdiction when a cause of action will succeed if "the laws of the United States are given one construction and will be defeated if they are given another." *Id.*

Such is the case here. Defendants move to dismiss based on their preferred interpretation of the CEA—for example, whether Defendants traded commodities covered by the Act, or whether they acted as commodity pool operators. These arguments are better read as challenges to the scope, or "jurisdiction," of the CFTC, not this Court.

Arguments that the CFTC's claims are devoid of legal merit should be brought under Rule 12(b)(6), not Rule 12(b)(1). *See CFTC v. White Pine Tr. Corp.*, 574 F.3d 1219, 1222, n.2 (9th Cir. 2009); *see also CFTC v. Brockbank*, No. 2:00-CV-622 TS, 2006 WL 223835 (D. Utah Jan. 30, 2006), at *2-*3 ("The question instead is whether the claims are so completely devoid of merit as to not involve a federal controversy – a standard akin to the Rule 12(b)(6) standard."). The Court will address substantive legal questions of the CFTC's "jurisdiction" as they pertain to each count. But as an initial matter, this Court affirms its subject-matter jurisdiction over this case.

## II.    Count III: Fraud in Connection with Trade of Commodities

In Count III, the CFTC charges Defendants under the CEA's anti-fraud provision. Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1, 17 C.F.R. §

9

180.1 (2015), make it unlawful for any person to intentionally or recklessly employ, or attempt to use or employ any manipulative device, scheme, or artifice to defraud in connection with a "contract of sale . . . of any commodity in interstate commerce." The CFTC alleges that Defendants defrauded fund participants by making material misrepresentations and/or misappropriating customer funds. Defendants dispute the materiality of Ikkurty's statements, as well as the scienter element.

### a. Defendants transacted in commodities covered by the CEA

At the outset, Defendants argue that they cannot be held liable under the CEA because they did not engage in the sale of a covered commodity. In its complaint, the CFTC identified two cryptocurrencies, Bitcoin and Erethreum, as commodities that Defendants invested in. Through discovery, the CFTC also identified two additional cryptocurrencies, OHM and Klima. Defendants argue that the CFTC's statutory authority does not extend to any cryptocurrencies.

The CEA defines commodities as "all services, rights, and interests (except motion picture box office receipts, or any index, measure, value or data related to such receipts) in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9). Courts roundly recognize cryptocurrencies as falling under this broad definition. *CFTC v. Laino Grp. Ltd.,* No. 4:20-CV-03317, 2021 WL 4059385, at *6 (S.D. Tex. June 30, 2021) (collecting cases); *CFTC v. McDonnell,* 287 F.Supp.3d 213, 229 (E.D.N.Y. 2018). This is because cryptocurrencies share a "core characteristic" with "other commodities whose derivatives are regulated by the CFTC," namely, that they are "exchanged in a market for a uniform quality and

value." *United States v. Reed,* No. 20-CR-500, 2022 WL 597180, at *3 (S.D.N.Y. Feb. 28, 2022) (quoting *McDonnell,* 287 F.Supp.3d at 228) (affirming CFTC jurisdiction over spot trade commodity fraud in cryptocurrency). These factual similarities, as well as the plain language of statutory and regulatory guidelines, allow the CFTC to expand its jurisdiction from ""future" contracts for commodities to "spot trade commodity fraud." *Id.* at 229. Defendants thus had sufficient notice that trading in virtual currencies subjects them to regulation by the CFTC.

Defendants object for a few reasons. First, they did not invest in Bitcoin itself, but "wrapped Bitcoin," a digital token pegged to the value of Bitcoin. DSOF ¶ 36. Defendants also point out that their investments in wrapped Bitcoin and Erethreum made up a "relatively small percentage of their holdings." *Id.* These arguments are unavailing, as the "in connection with" requirement of 7 U.S.C. § 9(1) and 17 C.F.R.§ 180.1 is "construed broadly." *CFTC v. Notus LLC,* 22-CV-20291, 2024 WL 1717486, at *10 (S.D. Fla. Apr. 22, 2024). Moreover, it is undisputed that Defendants invested a substantial amount of customer funds into OHM and Klima, two non-Bitcoin virtual currencies that qualify as commodities. PSOF ¶¶ 45, 64; *See CFTC v. My Big Coin Pay, Inc.,* 334 F. Supp. 3d 492, 498 (D. Mass. 2018) (finding non-Bitcoin virtual currency is a commodity because "the CEA only requires the existence of futures trading within a certain class (e.g. "natural gas") in order for all items within that class (e.g. "West Coast" natural gas) to be considered commodities."). Considering the above circumstances, the Court finds that there is no genuine dispute that

Defendants transacted in cryptocurrencies that qualify as commodities under the CEA.

### b. Defendants made material misrepresentations of fact to fund participants

To prove its claim for commodities fraud on a misrepresentation theory under 7 U.S.C. § 9(1) and 17 C.F.R.§ 180.1, the CFTC must show (a) Defendants made a misrepresentation, misleading statement, or a deceptive omission; (b) acted with scienter; (c) the misrepresentation or omission was material; and (d) was made in connection with a contract of sale for a commodity in interstate commerce. *CFTC v. Long Leaf Trading Grp., Inc.,* No. 20 C 03758, 2022 WL 2967452, at *5 (N.D. Ill. July 27, 2022), judgment entered, No. 20-CV-3758, 2023 WL 3170062 (N.D. Ill. Mar. 29, 2023) (quoting *CFTC v. Caniff,* 2020 WL 956302, at *7 (N.D. Ill. Feb. 27, 2020)).

To prove scienter, the CFTC must show that Defendants acted intentionally or recklessly. *Notus,* 2024 WL 1717486, at *8 (quoting *CFTC v. R.J. Fitzgerald & Co.,* 310 F.3d 1321, 1328 (11th Cir. 2002)) (discussing scienter in the context of 7 U.S.C. § 6b claims, which apply the same standard); *see also CFTC v. Kraft Foods Grp., Inc.,* 153 F.Supp.3d 996, 1007 (N.D. Ill. 2015) (discussing scienter in the context of fraud claims under Section 10(b) of the Exchange Act and adopting standard for analogous CEA provisions). Scienter can also be established by proof of "highly unreasonable omissions or misrepresentations that present a danger of misleading [customers] which is either known to the Defendant or so obvious that Defendant must have been aware of it." *R.J. Fitzgerald,* 310 F.3d at 1328 (cleaned up). The CFTC need not prove

"an evil motive or intent to injure the customer." *Cange v. Stotler & Co.,* 826 F.2d 581, 589 (7th Cir. 1987).

A statement is material if it is substantially likely that a reasonable investor would consider the issue important to making an investment decision. *CFTC v. Kratville,* 796 F.3d 873, 895 (8th Cir. 2015). "Proof of customer reliance is not required." *Long Leaf,* 2022 WL 2967452, at *5 (citing *Slusser v. CFTC,* 210 F.3d 783, 785-86 (7th Cir. 2000)). Finally, as for the "in connection with" requirement, "[a]ctionable misrepresentations include those made to customers when soliciting their funds." *CFTC v. Driver,* 877 F.Supp.2d 968, 978 (C.D. Cal. 2012) (quoting *CFTC v. Rosenberg,* 85 F.Supp.2d 424, 447-48 (D.N.J.2000)).

The CFTC presents evidence of four categories of misrepresentations made by Ikkurty on behalf of Defendants: misstatements as to (1) the RCIF I fund performance; (2) the fund's distribution of net profits, (3) Ikkurty's investment methodology (or lack thereof), and (4) Ikkurty's background and experience.

### i. RCIF I historical performance

It is undisputed that Ikkurty recruited RCIF II participants with PowerPoint presentations that contained false representations about the historical performance of RCIF I. *See* PSOF ¶¶ 31-43. Defendants dispute the materiality of these misstatements, arguing that RCIF II participants understood that historical returns were not guarantees of future performance. *See* DRSOF ¶ 54 (citing participants' deposition testimony that they understood crypto assets could be volatile). However, participants' general understanding of crypto markets cannot balance out Ikkurty's

hyper-specific statements about the fund's past performance. *See R.J. Fitzgerald & Co.,* 310 F.3d at 1330 (finding general disclosure of risk does not "preclude liability under the CEA where the overall message is clearly and objectively misleading or deceptive"). Failure to fully disclose previous customers' losses is a material omission. "A reasonable investor would want to know that the person or firm to whom she is entrusting her money has a history of losing customers' investments." *Long Leaf,* 2022 WL 2967452, at *5. And contrary to Defendants' arguments, inaccurate reporting can influence customers' expectations of future profit. *See CFTC v. U.S. Metals Depository Co.,* 468 F.Supp. 1149, 1159 (S.D.N.Y. 1979) (defendants' inaccurate profit projections constituted fraud); *CFTC v. Crown Colony Commodity Options, Ltd.,* 434 F.Supp. 911, 917 (S.D.N.Y. 1977) (salesman's incorrect statement that "no . . . customer ever lost money on his investment" was fraudulent).

Defendants also contend that Ikkurty lacked the requisite mental state. He offers no alternative explanation, though, for how he could have repeatedly made false factual statements. As the owner and principal investor for RCIF I, Ikkurty had knowledge of the fund's true performance. PSOF ¶ 59. His failure to disclose losses sustained by RCIF I investors is a paradigmatic "highly unreasonable omission[] or misrepresentation[] that present[s] a danger of misleading [customers]" that Ikkurty had every reason to know about. *R.J. Fitzgerald,* 310 F.3d at 1328; *accord Long Leaf Trading Grp.,* 2022 WL 2967452, at *6 (finding fund CEO exhibited reckless disregard for the truth by omitting poor fund performance to current and potential customers); *CFTC v. Commonwealth Fin. Grp., Inc.,* 874 F.Supp. 1345, 1354 (S.D.

Fla. 1994) (same). In his desire to recruit customers, Ikkurty obfuscated and inflated past performance. There can be no genuine dispute that Ikkurty did so willingly. As a matter of law, the Court finds that Defendants acted at least recklessly in advertising false historical returns.

### ii. RCIF II returns of "net profit" to participants

The next misrepresentation alleged by the CFTC is that Defendants marketed RCIF II to participants as if they would receive "net profits," when Defendants only redistributed participants' funds. The facts of this misrepresentation are undisputed and show that Defendants ran something akin to a Ponzi scheme, unbeknownst to fund participants. *Perkins v. Haines,* 661 F.3d 623, 625 n.1 (11th Cir. 2011). ("The essence of a Ponzi Scheme is to use newly invested money to pay off old investors and convince them that they are earning profits rather than losing their shirts."); *accord Bosco v. Serhant,* 836 F.2d 271, 274 (7th Cir. 1987). Any reasonable investor would want to know that their monthly dividends was not real income, but only constituted other participants' investments. And as Ikkurty admits he knew that investors did not receive "net profits," the Court finds the scienter element can be reasonably inferred as well. *See S.E.C. v. Payne,* 1:00-CV-1265-JMS-TAB, 2011 WL 693604, at *3 (S.D. Ind. Feb. 18, 2011) (in securities context, defendant's "principal role in the Ponzi scheme and his admission that he engaged in these acts knowingly shows a high degree of scienter").

### iii. Use of RCIF II funds and investment risk

The CFTC also presents undisputed evidence that Defendants built an investment portfolio that was much more volatile than advertised to participants. It is undisputed that Ikkurty told potential investors that 65% of RCIF II funds would be put into "stable proof-of-stake tokens." PSOF ¶ 44. Defendants instead invested 90% of RCIF II funds in OHM, a cryptocurrency that Ikkurty admitted was not stable in 2021 and early 2022. *Id.* ¶ 45. Ikkurty made similar misrepresentations regarding CSN purchasers, *id.* ¶ 64, and he failed to inform COB purchasers that he pledged the *same* digital wallet as collateral to dozens of purchasers. *Id.* ¶ 68. Downplaying risks associated with customers' investments is a material misrepresentation. "[A] reasonable investor would want to know . . . the risk associated with that investment." *CFTC v. Rolando,* 589 F. Supp. 2d 159, 170 (D. Conn. 2008). Considering Ikkurty's knowledge and control over RCIF II investments, there can be no serious dispute over scienter.

### iv. Ikkurty's background and experience

Finally, the CFTC provides undisputed evidence that Ikkurty portrayed himself as a seasoned, skilled trader in cryptocurrency, PSOF ¶ 4-5; 47-48, when he actually had limited experience trading Bitcoin and other digital assets. Misrepresenting one's investment experience and skill to customers is fraudulent as a matter of law. *See, e.g., McDonnell,* 332 F. Supp. at 718; *CFTC v. Allied Markets LLC,* 371 F. Supp. 3d 1035, 1048 (M.D. Fla. 2019). This, too, qualifies as a material misrepresentation.

The CFTC has presented sufficient evidence that Defendants violated 7 U.S.C. § 9(1) and Regulation 180.1(a). Ikkurty on behalf of Jafia, made misrepresentations,

and those misrepresentations were material, made with scienter, and in connection with contracts for the sale of commodities covered by the CEA. This warrants a finding of summary judgment in favor of the CFTC on Count III.

### c. The CFTC has established that Defendants misappropriated funds through the Carbon Offset Program.

The CFTC also proceeds on a separate theory of fraud under the CEA, arguing that it is undisputed that Defendants misappropriated funds from CSN and COB purchasers to distribute inflated returns to RCIF I participants. "[S]oliciting or obtaining funds from investors for trading, then failing to trade the funds while using them for personal and business expenses, is misappropriation." *Driver,* 877 F.Supp.2d at 978 (quoting *CFTC v. Emerald Worldwide Holdings, Inc.,* No. CV-03–8339AHM, 2005 WL 1130588, at *7 (C.D.Cal. Apr. 19, 2005)). The misappropriation of funds solicited for trading is "willful and blatant fraudulent activity" that violates the CEA. *Weinberg,* 287 F.Supp.2d at 1106.

It is undisputed that in November 2021, the value of RCIF I collapsed by 99% with massive losses of nearly 54% in December 2021 and 97% in January 2022. SOF ¶ 41. In the natural course, RCIF I participants would have lost their investments. Instead, the documents establish that Ikkurty offered RCIF I participants "buyouts" from Jafia at the pre-crash values for their RCIF I investments, or alternatively, offered to give them COBs in those same pre-crash values. SOF ¶ 70. Significantly, these buyouts took place after the RCIF I losses occurred but prior to Defendants' monthly statements. According to the records, "Jafia paid $29,075,645.65 in cash and COBs to RCIF I participants for RCIF I stakes that would have been worth $7,682,406.80 if

17

the participants had been required to cash out at the prices at the end of the month." PSOF ¶ 72.

It is also undisputed that Ikkurty and Jafia entered into agreements or promissory notes with crypto savings note (CSN) and carbon offset bond (COB) participants where those participants paid for the CSN or COB up front and Jafia promised to pay 18% interest per annum, for a period of years, at which time Jafia would repay the principal. PSOF ¶¶ 62, 63. Ikkurty advertised that 80% of contributions would go into "stable proof of stake tokens." *Id.*, at ¶ 64. Ikkurty also advertised that he would use 8% of the CSN funds to buy "put option protection". *Id.*, at ¶ 65. He did not do either of these things. *Id.*

The CFTC relies on emails Ikkurty sent to two RCIF I participants. One on January 13, 2022, explained that "December was very bad where RCIF 1 dropped by more than 45%," and offered to "cash out [his] position on a high note" based on the November 30 statement—a value much higher. SOF ¶ 70.[3] That was good for that participant, but that money had to come from somewhere—Ikkurty used Jafia funds to give the investor the earlier (and higher) value. That is a classic Ponzi move.

The whole numbers also support the CFTC's position. Defendants paid $29 million to RCIF I participants for stakes that were worth only $7.7 million. SOF ¶ 72. That left Jafia with insufficient funds to pay the CSN and COB participants the $26 million, combined, they were owed plus 18% interest. SOF ¶ 73. Then when the CFTC

---

[3] Ikkurty does not dispute this fact but objects to the CFTC's reliance on an email from Ikkurty to an RCIF I investor offering them an option to cash out in the form of COB at greatly inflated value. [339] at ¶ 70. The Court may consider the email as a non-hearsay statement under FRE 801(d)(2), an opposing party's statement.

filed this litigation, Jafia only had $5.9 million in total assets. *Id.* That is a classic Ponzi scheme.

The facts are not disputed. The CFTC has presented sufficient evidence that Defendants violated 7 U.S.C. § 9(1) and Regulation 180.1(a). Ikkurty on behalf of Jafia, made misrepresentations, and those misrepresentations were material, made with scienter, and in connection with contracts for the sale of commodities covered by the CEA. The CFTC's motion for summary judgment on Count III is granted. Defendants' motion for summary judgment is denied.

### III.    Counts I and II: CPO failure to register and CPO fraud.

In Counts I and II, the CFTC alleges that Defendants acted as commodity pool operators (CPOs). Count I charges Defendants with failure to register as CPOs, in violation of Section 4m(1) of 7 U.S.C. § 6(m)(1), while Count II charges Defendants with fraud by a CPO, in violation of Section 4o(1)(A)-(B) of 7 U.S.C. § 6o(1)(A)-(B).

Defendants move for summary judgment on both counts on the basis that they did not act as CPOs because they did not (1) actually trade (2) covered commodities. The CFTC argues for summary judgment because the relevant statutory provisions require proof of solicitation of funds (as opposed to actual training) for the purpose of trading *commodity interests* (not commodities). The Court agrees with the CFTC's interpretation and finds that the CFTC has met its burden.

#### a.  There are no disputed facts that Defendants acted as a CPO.

It is undisputed that Defendants did not file for an exemption from CPO registration, PSOF ¶ 77. Section 1a(11) of the CEA defines a "commodity pool operator" (CPO) as "any person—(i) engaged in a business that is of the nature of a

19

commodity pool . . . or similar form of enterprise and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property ... for the purpose of trading in *commodity interests*, including any—(I) commodity for future delivery, security futures product, or swap . . ." 7 U.S.C. § 1a(11) (emphasis added). A commodity pool is similarly defined as "any investment trust, syndicate, or similar form of enterprise operated for the purpose of trading in commodity interests." *Id.* § 1a(10)(A).

Courts agree that the "plain language of [the statute] requires only that the entity be engaged in a business of the proper form, and it solicit, accept, or receive funds for the purpose of trading." *CFTC v. Equity Fin. Grp. LLC*, 572 F.3d 150, 156 (3d Cir. 2009) (emphasis added). There is no actual trading requirement. *Id.*; *United States v. Wilkinson*, 986 F.3d 740, 745 (7th Cir. 2021). "The specific provisions governing commodity pool operators are directed toward regulating activities involving the solicitation of funds" for commodity future transactions. *Equity Fin. Grp.*, 572 F.3d at 157. The CFTC must show there is no genuine dispute of material fact that Defendants *solicited funds*, not traded commodities. It is undisputed that Ikkurty solicited millions of dollars' worth of funds for investment.

Again, whether Defendants *actually* traded commodity interests is not of import. The CFTC has successfully brought CPO-related claims against defendants who solicited funds for the purpose of trading commodity interests, but never followed through on those trades. *See, e.g., CFTC v. Wilkinson*, No. 16-CV-6734, 2016 WL 8256406 (N.D. Ill. Nov. 22, 2016); *CFTC v. Weinberg*, 287 F. Supp. 2d 1100, 1108 (C.D.

Cal. 2003); *Equity Fin. Grp.*, 572 F.3d at 156-59. After all, the "remedial purposes of the statute would be thwarted if the operator of a fund could avoid the regulatory scheme simply by investing in another pool rather than trading." *Id.* at 158.

Next, the CFTC need not prove that Defendants traded in commodities (although they did prove that here). Rather, the question is whether the Defendant solicited funds for the purpose of trading in *commodity interests*. First, the CFTC cites to RCIF II's governing documents, namely the Private Placement Memorandum (PPM) and the Limited Partnership Agreement (LPA). Both documents contain language that allow RCIF II to invest in commodity interests. The LPA authorized Jafia, as the general partner in RCIF II, to "purchase, hold, sell, sell short and otherwise deal in commodities, commodity contracts, commodity futures, financial futures (including index 24 futures) and options . . . forward foreign currency exchange contracts, . . . derivatives, [or] swap contracts[.]" PSOF ¶ 11. The PPM similarly authorized investments in commodity interests and disclosed risks related to trading future derivatives, swaps, and options. *Id.* ¶ 12. The PPM also included a caveat regarding commodity interests:

> THE FUND DOES NOT CURRENTLY INTEND TO TRADE PRODUCTS THAT ARE REGULATED BY THE COMMODITY FUTURES TRADING COMMISSION ("CFTC"). IN THE EVENT THE FUND IN THE FUTURE DECIDES TO TRADE SUCH PRODUCTS, THE GENERAL PARTNER WILL FILE AN APPROPRIATE EXEMPTION OR REGISTER AS A COMMODITY POOL OPERATOR WITH THE CFTC.

DSOF ¶ 39.

It is undisputed that Ikkurty created a financial product called a "crypto savings note" (CSN) and advertised to potential buyers that he would use 8% of CSN funds to invest in "put option protection" on digital currencies. PSOF ¶¶64-65. A put option involving a commodity is a *commodity interest* covered by 7 U.S.C. § 1a(11). *See CFTC v. U.S. Metals Depository Co.*, 468 F. Supp. 1149, 1155 (S.D.N.Y. 1979). [4]

The language of these documents and Ikkurty's solicitation of funds to be used to invest in commodity interests are undisputed. This evidence establishes that Defendants solicited funds "for the purpose of trading in commodity interests" and therefore qualified as CPOs. When Ikkurty told investors that would invest in put option, he promised to invest in a commodity interest. At that point the Defendants were required to register as a CPO.[5] No rational jury could determine that Defendants were not required to register as a CPO. The Court therefore grants the CFTC's motion for summary judgment on Count I and denies Defendants' motion for summary judgment on Count I.

### b. The CFTC has established that Defendants committed CPO fraud.

Section 4o(1) of the Act, prohibits any CPO from using any means of interstate commerce to: (A) defraud any client or participant or prospective client or participant; or, (B) engage in any transaction, practice or course of business which operates as a

---

[4] It is further undisputed that Ikkurty did not use CSN funds to purchase said put options with funds from CSN investors. PSOF ¶ 65. This establishes Count III, committing CPO fraud.

[5] Further, the Court has determined that the two non-Bitcoin virtual currencies, OHM and Klima, qualify as commodities. *See supra* at 11. Defendants' arguments that the CFTC has failed to establish that they traded in any commodities is not well taken.

fraud or deceit upon any client or participant or prospective participant. 7 U.S.C. §6o(1). Section (A) required proof of scienter. The elements of Section 4o(1)(A) are coextensive with the elements of Section 6(c)(1) and Regulation 180.1(a), discussed previously. Each requires proof of: (1) a misrepresentation that is (2) material and (3) made with scienter. *See Kraft Foods,* 153 F. Supp. 3d at 1014 ("Under Regulation 180.1, the level of scienter required to plead a cause of action for manipulation is 'intentionally or recklessly.'"); *see CFTC v. Driver,* 877 F. Supp. 2d 968, 978 (C.D. Cal. 2012) ("The same intentional or reckless misappropriations, misrepresentations, and omissions of material fact . . . violate section 4o(1)(A)-(B) of the Act.").

As the Court has already determined the CFTC established these elements for a violation of Section 6 (c)(1) and Regulation 180.1 (Count III), the Court likewise grants summary judgment in favor of the CFTC as to Count II.

## IV.    Restitution and Disgorgement

The CFTC seeks equitable remedies against Defendants ordering restitution and disgorgement, jointly and severally.[6] Under 7 U.S.C. § 13a-1(d)(3), the Court may impose equitable remedies including "(A) restitution to persons who have sustained losses proximately caused by such violation (in the amount of such losses); and (B) disgorgement of gains received in connection with such violation." Because the CFTC

---

[6] Defendants do not dispute the amounts asserted by the CFTC. Instead, they "request the Court to allow separate briefing on the issues of restitution and disgorgement if they become relevant." [338] at 22. The Court declines to set further briefing. The briefing in this case was already delayed when Defendants obtained new counsel [318, 324]. No further delays are warranted. Particularly as Mr. Ikkurty is currently under an order of contempt. [299].

has established that Defendants have violated at least one provision of the CEA, the Court will proceed to assess the equitable remedies.

Obtaining restitution relief ordinarily requires proof of investors' individual reliance. *Driver*, 877 F.Supp.2d at 980. Yet where there are "consistent material misstatements or omissions in the context of a fraudulent scheme, the Court can assume reliance of the Defendants' customers on Defendants' fraud even though they did not testify." *McDonnell*, 332 F.Supp.2d at 720; *CFTC v. Ross*, 2014 WL 6704572. "A controlling person who knowingly induces the acts constituting a violation may be held liable to the same extent as the violating entity." *Long Leaf*, 2022 WL 2967452, at *9-10 (citing § 13c(b)).

The evidence clearly shows that Ikkurty was a controlling person of Jafia and personally participated in the acts that make up the CEA violation. He is therefore jointly and severally liable for Jafia's violations during his tenure as owner. *See* § 13c(b). Defendants do not dispute the total amount of RCIF I, RCIF II, CSN, and COB participant losses. As the undisputed evidence establishes that customer losses resulted in part from fraudulent omissions, the Court orders restitution in the amount of customer losses—$83,757,249—during Ikkurty's tenure ($83,757,249, inclusive of paid commissions) is proper. *See Long Leaf*, 2022 WL 2967452, at *9-10.

Defendants must also disgorge their collected commissions during the same period. *See CFTC v. Escobio*, 833 F. App'x 768, 772 (11th Cir. 2020). Defendants do not dispute that these gains total $36,967,285. PSOF ¶ 76. The amount owed in disgorgement shall be offset by any sums paid toward restitution.

Finally, the CFTC is entitled to summary judgment and disgorgement against the "relief defendants". The relief defendants in this matter, RCIF I, RCIF II and Seneca Venture all possess ill-gotten gains to which they have no legitimate claim. The Relief Defendants are also ordered to disgorge $36,967,285.

## CONCLUSION

For the stated reasons, the CFTC's motion for summary judgment [267] is granted with respect to Counts I, II and III. Defendants' motion for summary judgment and motion to dismiss is denied. [270].

E N T E R:

Dated: July 1, 2024

_____

MARY M. ROWLAND

United States District Judge